Frank A. WILLIAMS, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 72244.

Court of Criminal Appeals of Texas, En Banc.

Oct. 15, 1997.

Rehearing Denied Nov. 26, 1997.

John D. MacDonald, II, Conroe, for appellant.

Daniel C. Rice, District Attorney, Gail Kikawa McConnell, Assistant District Attorney, Conroe, Matthew Paul, State's Atty., for State.

## OPINION

MEYERS, Judge.

Appellant was convicted of capital murder and, pursuant to the jury's answers to the statutory punishment issues set forth in Texas Code of Criminal Procedure art. 37.071 §§ 2(b) and 2(e), sentenced to death.[1] Article 37.071 § 2(g). Direct appeal is automatic. Article 37.071 § 2(h).

Appellant raises five points of error, including challenges to the sufficiency of the evidence at both stages of trial. We will address appellant's sufficiency points first.

Viewed in the light most favorable to the verdict, the evidence at trial showed the following: On the morning of February 1, 1994, Deputy Sheriff Larry Demanche was called to the Deerwood Subdivision of Montgomery County by a woman concerned about her neighbor. The woman directed him to the victim's trailer where he discovered the victim's body lying on the floor inside. From the appearance of the body, Demanche determined that the victim had been dead for several days. Other officers were called to the scene.

As Detective Bonnie Morris canvassed the neighborhood for possible witnesses, she learned the victim frequented a place called "Bubba's Lounge." At "Bubba's," Morris was told that the victim had been dating a man by the name of Frank Williams, Sr.. In her attempt to locate Williams, Sr., Morris began calling telephone numbers discovered in the victim's trailer and eventually called appellant who identified himself as Frank Williams, Sr.'s son. Appellant lived in Conroe with his stepmother, Nina Williams, and his sister, Angela Ruth Guillory. From her conversation with appellant, Morris learned

---

1. All references to articles are to those in the Texas Code of Criminal Procedure in effect at the time of the offense unless otherwise indicated.

the whereabouts of Williams, Sr., and accompanied other detectives to talk to him. As a result of the interview, Williams, Sr., was dropped as a suspect in the case.

Further investigation of the crime scene revealed a shoe print impression on the back of the robe the victim had been wearing. A second shoe print impression was found on the tile floor in the kitchen. The investigating officer also noted that dresser drawers appeared to have been ransacked, a base for a cordless telephone had been jerked from the wall, and a purse appeared to have blood residue on the inside.

During the second day of investigating the crime, Leonard Carothers telephoned Detective David Moore and requested he come to a residence located in the same subdivision as the victim's trailer. When Moore arrived, he met with Leonard and Betty Carothers (appellant's stepfather and natural mother), Nina Williams, and Angela Guillory. Guillory informed Moore that she believed both her father, Frank Williams, Sr., *and* appellant were having affairs with the victim. Guillory and Nina also discussed certain behavior appellant had exhibited after his telephone conversation with Detective Morris the previous day.[2] The women told Moore that they had perceived unusual behavior on appellant's part on the Friday night before the victim's body had been found. Guillory stated that she suspected appellant of smoking "crack" that night and also that she had noticed what appeared to be blood around appellant's cuticles the following weekend. Nina and Guillory informed Moore that once they suspected something had happened, they began looking through the dirty clothes for "[a]nything with blood on it." They found a pair of appellant's shorts stained with what looked like blood. Nina handed Moore a plastic bag containing men's shorts. Appellant was located and taken to the station for questioning. Two detectives noticed at that time that appellant's tennis shoes appeared to have blood stains on them.

Appellant eventually gave a written and videotaped confession, turned over his shoes and three vials of blood, and consented to a search of his pickup. Appellant told the detectives that he had gotten off work around 5:30 p.m. on Friday, January 28th, cashed his paychecks, made his truck payment, and purchased some "crack." After going home to change, appellant went to the victim's house around 11:00 p.m.. Appellant stated that he had been in the victim's trailer just a few minutes when he picked up a pair of scissors and stabbed her repeatedly. He professed that he could not remember what had happened until he got up off the floor to get a towel. Appellant further stated that he took two of the victim's rings and went to a "crack" dealer's house before going home. During a subsequent interview, appellant commented that, prior to entering the trailer, he decided he would kill the victim if necessary to get her rings.

Further investigation led to the discovery of blood smears around a sink in appellant's trailer, a sweater from appellant's truck which appeared to have blood splatters on it, and blood stains on the driver's side of appellant's vehicle. Two lady's rings were recovered from a nearby pawn shop which Dennis Hines testified that he had pawned after giving a man fitting appellant's description twenty dollars for them.[3] Detectives were later notified that a billfold belonging to the victim was being held by a truck driver who had found it in a ditch along the highway between the victim's house and Conroe.

Upon subsequent scientific testing, investigators determined that the blood on one of appellant's shoes and sweater was consistent with the blood of the victim. The sole of appellant's right shoe and the partial shoe print found in the victim's kitchen were determined to be the same.

At punishment, the State presented a deferred adjudication order wherein appellant had pled to a charge of burglary of a habi-

---

2. Guillory stated that she entered the room as appellant hung up the telephone after his conversation with Morris and that appellant said, "Oh my God, this is all I need, I can't believe [the victim] is dead."

3. Hines stated that he received the rings on the night of January 28 from a man his brother brought to the house. Hines subsequently identified a picture of appellant as the man accompanying his brother on that occasion.

tation, a deferred adjudication order for appellant's commission of the offense of misdemeanor theft, and the testimony of a young man who told the jury that appellant had struck him when they were junior high school students, along with documents evidencing the juvenile court proceedings associated with this event. Evidence was presented that appellant had picked up an eleven-year-old boy and slammed him on his back for talking back to appellant.

Appellant offered the testimony of his mother and sister as to distressed family background and concluded with the testimony of Master's-level psychotherapist, Michelle Dennison. Among other conclusions, Dennison opined that appellant had a serious problem with drug abuse and had been using "crack" cocaine for 5–6 hours a day for the five months prior to the victim's murder, indicating a very severe addiction. On cross-examination, Dennison acknowledged the existence of records from appellant's job corps' training wherein it was disclosed that he had been involved in various fights and the destruction of property. Further, Dennison testified that appellant had told her that he had thought of killing people three times before he committed the instant offense, that he has a bad temper, and that he has poor coping skills.

■ In his first point of error, appellant claims the trial court erred in overruling his motion for instructed verdict presented at the conclusion of the State's case on guilt/innocence because the evidence is insufficient to sustain a verdict of "guilty" to the offense of capital murder. *See* TEX. PENAL CODE § 19.03(a)(2). Specifically, appellant claims the statement he made in his confession about being willing to kill the victim for her rings was not corroborated; therefore, he argues the evidence is insufficient to prove beyond a reasonable doubt that he murdered the victim in the course of robbing her.

■ A defendant's extrajudicial confession must be corroborated by other evidence tending to show that a crime was committed. *Chambers v. State*, 866 S.W.2d 9, 15 (Tex. Crim.App.1993), *cert. denied*, 511 U.S. 1100, 114 S.Ct. 1871, 128 L.Ed.2d 491 (1994). In other words, there must be evidence of the *corpus delicti*, independent of the defendant's confession. In capital murder cases, we have further held that an extrajudicial confession must be corroborated as to the underlying felony offense since it is part of the *corpus delicti*. *Id.* The corroborating evidence need not be sufficient by itself to prove the underlying offense; rather, "[a]ll that is required is that there be some evidence which renders the commission of the offense more probable than it would be without the evidence." *Id.* at 15–16. Thus, there need not be corroborating evidence sufficient alone to prove that appellant intended to kill the victim for her rings; the corroborating evidence need only make this conclusion more probable.

■ The murder scene itself showed signs of a robbery. Officers found ransacked dresser drawers and a purse with traces of blood on the inside, indicating it had been gone through by the murderer. There was testimony that appellant sold the victim's rings around 11 p.m. on the night of the murder to a man who later pawned them. Finally, the victim's billfold was found abandoned along the highway. These facts make more probable appellant's statement that he killed the victim for her rings and thus sufficiently corroborate his confession. *Chambers, supra; see also Gibbs v. State*, 819 S.W.2d 821 (Tex.Crim.App.1991), *cert. denied*, 502 U.S. 1107, 112 S.Ct. 1205, 117 L.Ed.2d 444 (1992). When viewed in a light most favorable to the verdict, given the corroborating evidence and appellant's confession, the evidence is sufficient to support the jury's finding beyond a reasonable doubt that appellant committed the murder in the course of committing a robbery. **Point of error one is overruled.**

■ In his second point of error, appellant claims the evidence is insufficient to support the jury's finding that he would be a continuing danger to society. Article 37.071 § 2(b)(1). In reviewing this legal sufficiency point, the Court looks at the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have believed beyond a reasonable doubt that appellant would probably commit criminal

acts of violence that would constitute a continuing threat to society. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Allridge v. State,* 850 S.W.2d 471 (Tex.Crim.App.1991), *cert. denied,* 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). The facts of the crime alone can be sufficient to support an affirmative finding to this special issue. *Allridge, supra.* In fact, the circumstances of the crime may provide greater probative evidence of a defendant's probability for committing future acts of violence than any other factor relevant to the second special issue. *Id.*

■ At trial, the jury is permitted to look at several factors in its review of future dangerousness including, but not limited to:

1. the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

2. the calculated nature of the defendant's acts;

3. the forethought and deliberateness exhibited by the crime's execution;

4. the existence of a prior criminal record, and the severity of the prior crimes;

5. the defendant's age and personal circumstances at the time of the offense;

6. whether the defendant was acting under duress or the domination of another at the time of the offense;

7. psychiatric evidence; and

8. character evidence.

*Barnes v. State,* 876 S.W.2d 316, 322 (Tex. Crim.App.), *cert. denied,* 513 U.S. 861, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994); *Keeton v. State,* 724 S.W.2d 58, 61 (Tex.Crim.App. 1987). These factors are also helpful in this Court's evaluation of this question.

As set out above, the evidence in the instant case shows a robbery and murder committed in a brutal manner. The choice of scissors as a weapon required that appellant be in close physical contact with his victim during the attack. *See Martinez v. State,* 924 S.W.2d 693, 696 (Tex.Crim.App.1996). Despite his personal relationship with the victim, appellant stated in his confession that he was prepared to kill the victim for her jewelry before he even entered her home. Appellant's confession indicated that he murdered the victim for the sole reason that he wanted money or valuables in order to buy "crack." These facts demonstrate a wanton and callous disregard for human life.

While the facts do not reveal longtime calculation on appellant's part to commit murder, they show some forethought and deliberation. Appellant parked two streets down from the victim's house, in an apparent effort to evade detection. Further, appellant told his psychotherapist that he had considered killing someone on three prior occasions.

Evidence also showed appellant's prior history of criminal offenses and violence towards others, including violence towards children. Finally, while no psychiatric evidence was presented on behalf of the State, appellant's own psychotherapist stated that appellant had a bad temper and poor coping skills.

Given this evidence, we conclude that a rational juror could have found that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society. *Jackson* and *Allridge,* both *supra.* **Point of error two is overruled.**

■ In his third point of error, appellant claims the trial court erred in denying his motion for leave to file for expert assistance *ex parte.* Appellant asserts that by being denied an *ex parte* hearing, he was forced to reveal to the State his reasons for needing an expert witness, thereby disclosing at least part of his defensive theory, in denial of his due process right to fundamental fairness as guaranteed by the Fourteenth Amendment to the United States Constitution and in violation of the work product doctrine.

Some four months prior to trial, appellant filed a "Motion for Leave to File Motion for Expert Assistance of a Psychiatrist Ex Parte." This motion was denied. Appellant was thereupon compelled to provide the State with a copy of his motion requesting the appointment of an expert to assist him.[4]

4. In his motion, appellant stated that he needed the services of a mental health professional be-

Attached to his motion and in support thereof, is the affidavit of a psychotherapist initially hired by appellant's family delineating specific reasons that an expert would be helpful to appellant's case. The trial judge required that a copy of this affidavit be provided to the State over appellant's objection. The expert who executed the affidavit is the same expert the trial judge thereafter appointed for the defense.

In *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court held that due process entitles an indigent defendant to the appointment of an expert to assist in his defense when the defendant makes a preliminary showing that the issue for which he seeks expert assistance is "likely to be a significant factor at trial." *Rey v. State,* 897 S.W.2d 333, 339 (Tex.Crim.App.1995); *De Freece v. State,* 848 S.W.2d 150 (Tex.Crim.App.), *cert. denied,* 510 U.S. 905, 114 S.Ct. 284, 126 L.Ed.2d 234 (1993). This holding is premised upon the notion that an indigent is entitled to "meaningful access to justice" which means that he should have "access to the raw materials integral to the building of an effective defense" thus ensuring "a proper functioning of the adversary process."

In order to make the required threshold showing for appointment of an expert under *Ake,* the indigent defendant's claim must be based upon more "than undeveloped assertions that the requested assistance would be

beneficial." *Caldwell v. Mississippi,* 472 U.S. 320, 323–24 n. 1, 105 S.Ct. 2633, 2637 n. 1, 86 L.Ed.2d 231 (1985). This Court has emphasized that a defendant will not succeed on his *Ake* motion absent adequate support behind his allegations:

> In cases holding that a sufficiency showing was not made under Ake, the defendant typically has failed to support his motion with affidavits or other evidence in support of his defensive theory, an explanation as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was reason to question the State's expert and proof.

*Rey,* 897 S.W.2d at 341. The question in this case is whether a defendant is entitled to make his *Ake* threshold showing *ex parte.*[5]

In *Ake,* the Supreme Court stated:

> When the defendant is able to make *an ex parte threshold showing* to the trial court that his [issue] is likely to be a significant factor in his defense, the need for the assistance of [an expert] is readily apparent.

*Ake,* 470 U.S. at 82–83, 105 S.Ct. at 1096 (emphasis added). While the Supreme Court's suggestion that the threshold showing should be made *ex parte* is dicta, it is consistent with the due process principles upon which *Ake* rests.[6] Pursuant to *Ake,*

---

cause his mental condition would be a significant factor at both phases of the trial. In particular, appellant noted that certain specifically enumerated "factors in the defendant's personal history could have contributed greatly to any participation of the defendant in this criminal episode and could either excuse the defendant of the conduct charged or be a factor to be considered in mitigation of punishment." Appellant did not specifically raise insanity or competency at trial. *See* Articles 46.02 and 46.03.

5. In *Norton v. State,* 930 S.W.2d 101 (Tex.App.—Amarillo 1996, pet. ref'd), this question was raised, but was never squarely addressed.

6. An *ex parte* hearing must be provided under federal law. 18 U.S.C. § 3006A(e)(1) states in pertinent part:

UPON REQUEST.—Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate repre-

sentation may request them in an ex parte application.

Furthermore, Federal Rule of Criminal Procedure 17(b) states in pertinent part:

**Defendants Unable to Pay**. The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense.

Explaining the purpose behind this provision, one court stated that the *ex parte* provision of the rule was not intended to protect the defendant from opposition from the prosecutor; rather, it was intended to shield the theory of his defense from the prosecutor's scrutiny. *United States v. Meriwether,* 486 F.2d 498 (C.A.Ala.1973), *cert. denied,* 417 U.S. 948, 94 S.Ct. 3074, 41 L.Ed.2d 668 (1974).

Notwithstanding this federal statutory requisite, *Ake* was on *certiorari* to the United States

due process requires the appointment of an expert

> to provide technical assistance to the accused, to help evaluate the strength of his defense, to offer his own expert [opinion] at trial if it is favorable to the defense, and to identify the weaknesses in the State's case, if any, by testifying himself and/or preparing counsel to cross-examine opposing experts.

*De Freece,* 848 S.W.2d at 159. In presenting an *Ake* motion a defendant will often, if not always, be seeking the assistance of an expert for purposes of developing a defensive theory or questioning a portion of the State's case. In order to make a threshold showing that the issue underlying the defensive theory or the issue in the State's case that the defense has reason to think is vulnerable, will be a significant factor at trial, the defendant necessarily has to explain his theories and describe with some specificity how an expert would assist him. We have indicated that a defendant needs to offer affidavits or "evidence" in making this showing. *Rey,* 897 S.W.2d at 341. The problem with requiring this showing to be shared with the State at the pretrial stage is that it compels a defendant to disclose to the State his defensive theories or "work product."[7] *See Washington v. State,* 856 S.W.2d 184, 188 (Tex.Crim. App.1993); *cf. Taylor v. State,* 939 S.W.2d 148 (Tex.Crim.App.1996)(when expert is appointed under *Ake,* that expert's conclusions are the work-product of defense counsel). In essence, if an indigent defendant is not entitled to an *ex parte* hearing on his *Ake* motion, he is forced to choose between either forgoing the appointment of an expert or disclosing to the State in some detail his defensive theories or theories about weaknesses in the State's case. This is contrary to *Ake*'s concern that an indigent defendant who is entitled to expert assistance have "meaningful access to justice," and undermines the work product doctrine.[8] We de-

Supreme Court out of the Oklahoma Court of Criminal Appeals. Thus, the quoted language was not premised upon the requisite in the federal provision.

**7.** A document that contains "comments by the attorney concerning his trial strategy or opinions of the strengths and weaknesses of the case" is privileged work product. *Washington,* 856 S.W.2d at 188. The Supreme Court has described the work-product doctrine as sheltering "[a]t its core ... the mental processes of the attorney, providing a privileged area within which [an attorney] can analyze and prepare his client's case." *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). The doctrine is a critical component of a properly functioning adversarial system:

> Historically, a lawyer is an officer of the court and is bound to work for the advancement of justice while faithfully protecting the rightful interests of his clients. In performing his various duties, however, it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. Proper preparation of a client's case demands that he assemble information, sift what he considers to be relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. That is the historical and the necessary way in which lawyers act within the framework of our system of jurisprudence to promote justice and to protect their clients' interests. This work is reflected, of course, in interviews, statements, memoranda, correspondence, briefs, mental impres-

sions, personal beliefs, and countless other tangible and intangible ways—aptly though roughly termed by the Circuit Court of Appeals in this case as the "Work product of the lawyer." Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.

*Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947).

**8.** *See, e.g., Ex parte Moody,* 684 So.2d 114, 120 (Ala.1996)(criminal defendant entitled to *ex parte* hearing on whether expert assistance is necessary, based on Fifth, Sixth, and Fourteenth Amendments to Constitution); *Brooks v. State,* 259 Ga. 562, 385 S.E.2d 81, 84 (1989), *cert. denied,* 494 U.S. 1018, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990)(indigent defendant who seeks appointment of expert is entitled to *ex parte* hearing on the motion); *Arnold v. Higa,* 61 Haw. 203, 600 P.2d 1383, 1385 (1979)(indigent defendant should be given opportunity to explain need for expenses in *ex parte* hearing upon request, so that defendant can particularize reasons without disclosing to State defensive theories); *State v. Touchet,* 642 So.2d 1213, 1219–21 (La.1994)(indigent defendant is entitled to make initial *ex parte* application for government funding of expert assistance, but must make showing of preju-

cline to hold that in order for an indigent defendant to avail himself of one of the "basic tools of an adequate defense," he may be compelled to disclose defensive theories to the prosecution. We hold that an indigent defendant is entitled, upon proper request, to make his *Ake* motion *ex parte*. The trial judge erred in overruling appellant's request to make his *Ake* motion *ex parte*.

■ Appellant argues that the failure to grant an *ex parte* hearing is structural in nature and therefore immune from a harm analysis, citing *Rey*. In *Rey* we held that the total deprivation of expert assistance to which the defendant was entitled under *Ake* was a structural defect because "the structural underpinnings of [the] trial, from beginning to end, were affected by his inability to present an effective defense." *Rey*, 897 S.W.2d at 345. The same cannot be said of compelling a defendant to present his *Ake* motion in the presence of the State, revealing to at least some degree, the nature of his

dice in order to get *ex parte* hearing on the application); *People v. Loyer*, 169 Mich.App. 105, 425 N.W.2d 714, 722–23 (1988)(holding unconstitutional statute requiring disclosure to State of witness' names and expected testimony in order for indigent defendant to obtain payment of subpoena and witness fees); *State v. Ballard*, 333 N.C. 515, 428 S.E.2d 178, 180, *cert. denied*, 510 U.S. 984, 114 S.Ct. 487, 126 L.Ed.2d 438 (1993)(indigent defendant entitled to *ex parte* hearing on request for psychiatric expert); *McGregor v. State*, 733 P.2d 416 (Okla.Crim.App.1987)(hearing on *Ake* motion must be conducted *ex parte*); *State v. Barnett*, 909 S.W.2d 423, 429–30 (Tenn.1995)(*ex parte* hearing required in context of indigent's request for psychiatric expert); *but see State v. Apelt*, 176 Ariz. 349, 861 P.2d 634 (1993), *cert. denied*, 513 U.S. 834, 115 S.Ct. 113, 130 L.Ed.2d 59 (1994)(indigent defendant not entitled to *ex parte* hearing on request for assistance); *State v. Floody*, 481 N.W.2d 242 (S.D.1992).

The Fifth Circuit has recognized that a rule requiring an *ex parte* hearing for an indigent's request for a subpoena at government expense shields defensive theories from the State:

[T]he rule [previously] required that all defendants proceeding *in forma pauperis* who request subpoenas issued at government expense must support such requests with affidavits "in which the defendant shall state the name and address of each witness and the testimony which he is expected by the defendant to give if subpoenaed, and shall show that the evidence of the witness is material to the defense...." *The difficulty with this procedure was that it required indigent defendants to reveal many of*

defensive theories. This is more like the erroneous admission of evidence. Appellant still got the benefit of an expert to assist in his defense. Disclosure to the State of some defensive theory is more amenable to an assessment of harm than the total deprivation of an expert to present an effective defense.

■ The question, then, is whether the trial court's failure to allow appellant to make his *Ake* motion *ex parte* was harmless beyond a reasonable doubt.[9] Tex.R.App. Proc. 44.2. Appellant's motion revealed that appellant had related to counsel facts about his history of drug abuse as well as a history of being abused as a child and alleged that these factors could excuse appellant's conduct or be a factor in mitigation of punishment. The expert's attached affidavit included the expert's qualifications, a statement that her conclusions therein only amounted to a preliminary evaluation, her conclusions

*the theories of their defense to the prosecution, although defendants able to pay for witnesses were able to have blank subpoenas issued.* F.R.Crim.P., Rule 17(a). To cure this inequitable situation, Congress amended the rule in 1966 to provide that applications for subpoenas by defendants unable to pay for them be made to the court *ex parte*. ... The *ex parte* provision of the rule was not intended to protect the defendant from opposition from the prosecutor; it was intended to shield the theory of his defense from the prosecutor's scrutiny.... The government should not be able to obtain a list of adverse witnesses in the case of a defendant unable to pay their fees when it is not able to do so in the cases of defendants able to pay witness fees. When an indigent defendant's case is subjected to pre-trial scrutiny by the prosecutor, while the monied defendant is able to proceed without such scrutiny, serious equal protection questions are raised, and it appears that a major reason for the amendment was to avoid such questions.

*United States v. Meriwether*, 486 F.2d 498, 505–506 (5th Cir.1973)(emphasis added).

9. The error here is constitutional in nature. Therefore, the case must be reversed "unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." Tex.R.App. Proc. 44.2(a). This portion of the newly promulgated harmless error rule is identical to the previous Rule of Appellate Procedure 81(b)(2). Under this rule, the burden is on the State to prove that the error made no contribution to the defendant's conviction or punishment.

as to certain disorders from which appellant might be suffering, and a statement that a complete evaluation would require further testing and examination.

Although appellant's motion states that his mental condition would be "a significant factor at both phases of the trial," and that certain enumerated factors "could have contributed greatly to any participation of the defendant in this criminal episode," we do not discern anywhere in the guilt/innocence phase of trial where a legal defense based upon appellant's mental condition was raised and argued. Nor does any psychiatric or psychological testimony appear at this phase of trial. Hence, we conclude beyond a reasonable doubt that the State gained no advantage from receipt of the *Ake* information prior to trial and hold that disclosure of appellant's motion and affidavit to the State did not harm appellant as to the first stage of the trial.

At punishment, the State offered no mental health experts. Appellant called his expert to the stand. While her qualifications and the facts and data underlying her opinion were at that point discoverable to the State pursuant to Criminal Rule of Evidence 705, we cannot conclude beyond a reasonable doubt that the premature disclosure of the matters to which this expert testified did not contribute to the jury's verdict at punishment. The State was more prepared to cross-examine appellant's expert, both in the Rule 705 hearing and before the jury, than it would have been without the earlier insight into this aspect of appellant's case. While the evidence offered by the State at punishment was sufficient to support the jury's verdict, it was not overwhelming. The State has failed to meet its burden of proving that the disclosure did not contribute to the jury's verdict at punishment. **Point of error three is overruled as to the guilt phase of trial, but sustained as to the punishment phase.**

■ In his fourth point of error, appellant claims the trial court erred in permitting the admission of two photographs of the victim and the crime scene. Specifically, appellant says the photographs were irrelevant and their prejudicial impact substantially outweighed their probative value.

■ The admissibility of a photograph is within the sound discretion of the trial judge. Generally, a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible. *See Long v. State,* 823 S.W.2d 259, 271–72 n. 18 (Tex. Crim.App.1991), *cert. denied,* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992). In other words, if verbal testimony is relevant, photographs of the same are also relevant. Testimony, and thus photographs, of the crime scene aid the jury in determining many things including the manner and means of the death of the victim, the force used, and sometimes even the identity of the perpetrator.

In the instant case, the photographs were relevant to show the manner and means of the victim's death, the force used, and to some degree, the length of time the victim had been dead. Hence, the judge did not abuse his discretion in determining the photographs to be relevant.

■ Appellant further contends that the photographs were more prejudicial than probative and that the trial judge failed to engage in the proper balancing test. *See* TEX. R.CRIM. EVID. 403; *Ramirez v. State,* 815 S.W.2d 636, 646 (Tex.Crim.App.1991); *Long, supra.* When the photographs were introduced at trial, appellant objected to their admission and the trial judge overruled his objections without further comment. Once a Rule 403 objection as to prejudice versus probative value is invoked, the trial judge has no discretion as to whether or not to engage in the balancing test required by that rule. *See Long, supra.* However, a trial judge is not required to *sua sponte* place any findings he makes or conclusions he draws when engaging in this test into the record, nor did appellant request such to be affirmatively shown. *Green v. State,* 906 S.W.2d 937 (Tex. Crim.App.1995); *McFarland v. State,* 845 S.W.2d 824, 842 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993). Rather, a judge is presumed to engage in the required balancing test once Rule 403 is invoked and we refuse to hold that the silence of the record implies

otherwise. *See Santellan v. State*, 939 S.W.2d 155, 173 (Tex.Crim.App.1997).

 Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Montgomery v. State*, 810 S.W.2d 372, 389 (Tex.Crim.App.1990); *see also Long*, 823 S.W.2d at 271. A court may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include, but are not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. *Long, supra.* The availability of other means of proof and the circumstances unique to each individual case must also be considered. *Id.*

 The two photographs about which appellant complains are each approximately eight by ten inches in size.[10] One shows the clothed upper half of the victim's body in the position she was found and the other shows the victim after she was rolled over onto a what appears to be a bodybag by investigators at the scene. The first photograph depicts the body and the surrounding area as they were originally seen by investigators. Some of the injuries inflicted upon the victim can be seen from this angle. The second photograph better shows the different injuries and the extent of the damage inflicted upon the victim. Both photographs are somewhat gruesome, primarily due to the amount of blood depicted. However, they are no more gruesome than the facts of the offense itself. *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex.Crim.App.1995).

While the appearance of a bodybag in the second photograph might be somewhat prejudicial, any prejudice caused does not substantially outweigh the probative value of the photograph. Further, because these photos are few in number, depict the wounds inflicted upon the victim, the relative location and position in which she was discovered, and were the subject of testimony at trial, their probative value is not substantially outweighed by their possible prejudicial effect. **Point of error four is overruled.**

We affirm the conviction but vacate the sentence and remand this cause for a new sentencing hearing. Article 44.29(c); *Ransom v. State*, 920 S.W.2d 288, 303 (Tex.Crim. App.1994).

McCORMICK, P.J., concurs.

HOLLAND, J., dissents.

MANSFIELD, Judge, dissenting.

I respectfully dissent. Although I agree with the majority that the trial court erred in not allowing appellant to make his threshold *Ake* showing *ex parte*, I am persuaded that, given the particular facts of this case, that error was harmless beyond a reasonable doubt as to appellant's conviction and punishment. See Tex.R.App. Proc. 44.2(a).

In *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 1096, 84 L.Ed.2d 53 (1985), the Supreme Court of the United States held that the Due Process Clause of the Fourteenth Amendment entitles an indigent defendant to the appointment of a psychiatrist, at State expense, to assist the defendant in his defense when the defendant makes a threshold showing that the issue on which the psychiatric assistance is sought is going to be a significant factor at trial. The *Ake* Court explained, in relevant part:

This Court has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on

---

10. We note that neither the actual photographs nor color photocopies were included in the record. If appellant believed that the colors in the actual photographs would have made a difference in our assessment of prejudice, it was incumbent upon him to ensure that either the original photographs or color photocopies were included in the record. Tex.R.App. Proc. 50(b) and (d); 53(a); *Cf.* Rule 51(d); *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex.Crim.App.1995). *See also Webb v. State*, 760 S.W.2d 263, 276 n. 19 (Tex.Crim.App.1988), *cert. denied*, 491 U.S. 910, 109 S.Ct. 3202, 105 L.Ed.2d 709 (1989).

the Fourteenth Amendment's due process guarantee of fundamental fairness, derives from the belief that *justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake.*

\* \* \*

... We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.

\* \* \*

... *When the defendant is able to make an ex parte threshold showing to the trial court that his sanity is likely to be a significant factor in his defense,* the need for the assistance of a psychiatrist is readily apparent.

\* \* \*

We therefore hold that when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake v. Oklahoma,* 470 U.S. at 76, 77, & 82–83, 105 S.Ct. at 1092, 1093, & 1096 (emphasis added).[1]

If the Supreme Court's explicit language was not enough to make clear that due process entitles a defendant to make his threshold *Ake* showing *ex parte,* several other high courts have specifically so held, and with good reason. See, *e.g., Ex parte Moody,* 684 So.2d 114, 120 (Ala.1996); *Brooks v. State,* 259 Ga. 562, 385 S.E.2d 81, 84 (1989); *McGregor v. State,* 733 P.2d 416 (Okla.Crim. App.1987); *State v. Barnett,* 909 S.W.2d 423, 428–429 (Tenn.1995). That fundamental fairness, as guaranteed by the Due Process Clause, requires an *ex parte* hearing is apparent. "Indigent defendants who must seek state funding to hire a psychiatric expert should not be required to reveal their theory of defense when their more affluent counterparts, with funds to hire experts, are not required to reveal their theory of defense, or the identity of experts who are consulted, but who may not, or do not, testify at trial." *State v. Barnett,* 909 S.W.2d at 428. "If *ex parte* hearings are not required, indigent defendants would, in effect, be penalized for requesting psychiatric expert assistance by being required to disclose [sensitive] information, and may be deterred from seeking it because of the breadth of disclosure required." *Id.* at 429. Non-indigent defendants, on the other hand, would not face this dilemma.

Having said all that, I still believe that, under the particular facts of this case, the trial court's error in not affording appellant an *ex parte* hearing was harmless beyond a reasonable doubt as to appellant's conviction and punishment. The majority concedes the error was harmless with respect to appellant's conviction. With respect to appellant's punishment, the majority argues only that the error was not harmless because it resulted in the State having "premature" access to the defense psychotherapist's initial affidavit, which contained (1) her qualifications, (2) her conclusions regarding certain mental disorders from which appellant might be suffering, (3) an admission that her conclusions were preliminary, and (4) a statement that a complete evaluation of appellant would require further examination. The majority concedes that, at the time the defense psychotherapist took the stand at the punishment stage, the State was entitled to the affidavit anyway under Texas Rule of Criminal Evidence 705(b), but the majority nevertheless insists that appellant was harmed because the State's "premature" access to the affidavit rendered the State "more prepared" to crossexamine the psychotherapist than it otherwise would have been.

---

1. We later held that *Ake* applies to non-psychiatric experts, as well. *Rey v. State,* 897 S.W.2d 333, 337 (Tex.Crim.App.1995).

I disagree. I believe this case presents a classic case of harmless error. The only real effect of the error here was to give the State early access to an affidavit of the defense's expert, but the State was ultimately entitled to the affidavit anyway under Rule 705(b).

I would affirm the judgment of the trial court.

KELLER, Judge, dissenting.

Assume that it was error in this particular case for the trial judge to deny appellant's motion for leave to file his motion for expert assistance *ex parte*. The question then arises: is it constitutional error, analyzed under Tex.R.App. P. 44.2(a), or non-constitutional error, analyzed under Rule 44.2(b)? The majority says that the error is constitutional in nature. Op. at fn 4.

*Ake* error is a violation of due process, but there was no *Ake* error in this case—appellant was not denied an expert. The only way the error here could conceivably be considered to be constitutional would be if it somehow resulted in ineffective assistance of counsel. But if the error is ineffective assistance of counsel, in order to prevail appellant must meet the second prong of *Strickland*, i.e., he must meet the burden of establishing harm. If he meets that prong, he has exceeded what he needs to prove under either (a) or (b) of the harmless error rule, and he gets relief. Appellant would actually be better off if this is non-constitutional error because in that case his burden is less than the burden imposed by the second prong of *Strickland*. But in any event, the error should not be analyzed, as it is by both the majority and Judge Mansfield, under R. 44.2(a).

If the error here is ineffective assistance of counsel, I would find that appellant has failed to carry his burden of showing harm under *Strickland*. If the error is a simple violation of the workproduct doctrine, I would find it harmless under R. 44.2(b).

I also disagree with the majority's treatment of appellant's first point of error. In my opinion, the law does not require proof of the *corpus delicti* of the underlying felony in a capital murder case. *See Monterrubio v.*

*State,* 916 S.W.2d 506 (Tex.Crim.App.1996), (Keller, J. dissenting.)